IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| RENAISSANCE ACADEMY FOR MATH AND SCIENCE OF MISSOURI, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | No. 4:13-CV-00645-NKL |
| v. | ) ) | |
| IMAGINE SCHOOLS, INC., | ) ) | |
| Defendant. | ) ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In November 2007, Plaintiff Renaissance Academy for Math and Science, a charter school, and Defendant Imagine Schools, a charter school management company, entered into an Operating Agreement in which Imagine Schools agreed to provide management services to Renaissance for the operation of its charter school. After the termination of their agreement, Renaissance filed this lawsuit against Imagine Schools alleging breach of fiduciary duty (Counts I-III), unjust enrichment (IV), conversion (V), and violations of the Racketeer Influenced Corrupt Organizations Act (RICO) (VI-VII).

The case was tried before the Court over a one-week period. The Court now makes the following findings of fact and conclusions of law.

## I.    Counts VI and VII – Violations of RICO, 18 U.S.C. §§ 1962(c)-(d)

The Court finds in favor of Imagine Schools on Counts VI and VII. The greater weight of the evidence shows that Imagine Schools was the owner of SchoolHouse Finance during the relevant time period. Because there is a unitary interest between the

1

two legal entities, they could not conspire with each other or engage in a RICO enterprise according to Eighth Circuit law. *See Fogie v. THORN Americas, Inc.*, 190 F.3d 889, 898 (8th Cir. 1999) (holding that a wholly-owned subsidiary is not sufficiently distinct from its parent company so as to establish § 1962(c)'s requirement of an "enterprise"). Although there is evidence that Imagine Schools and SchoolHouse Finance filed legal documents subject to the rules of perjury that show a different ownership pattern, the Court concludes those filings were a product of gross negligence and shocking disregard for the law. They were not reflective of who actually owns SchoolHouse Finance. While Renaissance has cited a Seventh Circuit case recognizing exceptions to the unitary rule, *Bucklew v. Hawkins, Ash, Baptie & Co., LLP*, 329 F.3d 923 (7th Cir. 2003), the Eighth Circuit has not recognized a similar exception, and even the exception cited by the Seventh Circuit is not applicable to the facts of this case.

## II. Counts I-III – Breach of Fiduciary Duty

### A. Existence of Fiduciary Duty

Missouri uses a five factor test to determine whether there is a fiduciary relationship. *Chmieleski v. City Products Corp.*, 660 S.W.2d 275, 294 (Mo. Ct. App. 1983). To satisfy the test, Renaissance was required to prove that:

> (1) as between the parties, one must be subservient to the dominant mind and will of the other as a result of age, state of health, illiteracy, mental disability, or ignorance;
> (2) things of value such as land, monies, a business, or other things of value which are the property of the subservient person must be possessed or managed by the dominant party;
> (3) there must be a surrender of independence by the subservient party to the dominant party;

Case 4:13-cv-00645-NKL   Document 136   Filed 12/18/14   Page 2 of 29

(4) there must be an automatic or habitual manipulation of the actions of the subservient party by the dominant party; and

(5) there must be a showing that the subservient party places a trust and confidence in the dominant party.

*Id.*

All five factors weigh in favor of finding a fiduciary relationship between Renaissance and Imagine Schools. The Renaissance Board was subservient to Imagine Schools as a result of its inexperience with starting and operating a charter school. Mr. Paul Faber, Imagine Schools' witness, testified that he believed the Renaissance board members were enthusiastic and engaged but were not qualified to run a charter school. Doctor Deborah Carr from the University of Missouri – the sponsor of the charter school – also indicated that the board members wanted to do a good job but declined to say that they were equipped to do the job. Although a few members of the Renaissance Board – such as Ms. Tomika Booker and Ms. Wanda Frazier – had prior experience serving on a charter school board, their testimony and the record generally shows they were not qualified to act as competent, independent board members. This is also true of Representative Michael McGhee, not only based on his lack of experience with charter schools and his obvious misunderstanding of what was going on, but also because he had family members who worked for Imagine Schools and because his political campaign received large contributions from persons in the management of Imagine Schools. Mr. Curtis Rogers, a highly qualified and experienced public school administrator, would be expected under ordinary circumstances to be a competent and independent board member. Nonetheless, it was his understanding that Imagine Schools had authority over

3

the Renaissance Board, and that it was Imagine Schools that started the school not the Renaissance Board. He was very competent and very confused. Doctor Carr also gave strong evidence that Imagine Schools was the dominant party *vis a vis* the Renaissance Board.

Finally, it is not surprising that the Renaissance Board was weak and confused. Imagine Schools recruited the board members, arranged for the board members to apply for the charter and then entered into an Operating Agreement with the Renaissance Board that required the Board to give Imagine Schools all of the tax revenues that the Board was entitled to receive as a charter school. Under Missouri law, Imagine Schools could not obtain that revenue stream itself absent the formation of the Renaissance Board. In short, there is no evidence that Imagine Schools made any effort to recruit an independent board or to strengthen the independence of the Renaissance Board once selected. In fact, it is the policy of Imagine Schools to control the board rather than vice versa, as evidenced by the statement of Dennis Bakke, the owner and founder of Imagine Schools. [Exh. P158]. Mr. Bakke clearly believed that the Renaissance Academies belonged to Imagine Schools and that the job of the Renaissance Board was to go along with Imagine Schools' decisions unless Imagine Schools was engaging in illegal activity. In fact, Mr. Bakke encouraged his executives to limit and discourage board member control of "Imagine's" charter schools by obtaining pre-signed, undated resignation letters from board members at the time they joined the a board so that board members could be expelled at any time he or she asserted too much authority. *Id.* It is therefore not a surprise that Mr. Rogers, with all his experience as a public school administrator, did not understand that the

4

Renaissance Board was to give direction to Imagine School and not vice versa. Further, in contrast to the status of the Renaissance Board, Imagine Schools is one of the nation's largest charter school management companies and specializes in managing the operations of charter schools.

Imagine Schools also possessed virtually all of Renaissance's money and property. By the terms of the Operating Agreement that Renaissance signed, the Renaissance Board was required to give Imagine Schools all revenue and property that Renaissance received from the taxpayers. Without the Renaissance Board, Imagine Schools could not get access to that money.

There was also a surrender of independence by Renaissance to Imagine Schools – to the extent it had any meaningful independence at all. Doctor Carr testified that it was a problem that the Operating Agreement allowed Imagine Schools to do essentially everything for the school and that it was difficult to get relevant documentation that was understandable – even though she was an education expert herself. The lack of meaningful access to information about the school was a recurring theme throughout the trial. While the Renaissance Board theoretically had authority to act independently on some limited issues, it was in fact a captive of Imagine Schools both by design and by operation. While this changed over time with the assistance of the sponsor, the University of Missouri, intervention occurred too late to save the school, which operated consistently with too few expenditures for instruction and low student performance.

Imagine Schools also habitually manipulated Renaissance's actions. The Renaissance Board served as a rubber stamp for the actions of Imagine Schools, and

Imagine Schools indirectly exerted pressure on Renaissance board members to execute certain documents. Imagine Schools made it difficult for the Renaissance Board to get timely information it needed in a format that the board members could understand. While Imagine Schools occasionally went through the motions, a pattern of obstruction – consistent with Mr. Bakke's philosophy – made it difficult for the Renaissance Board to be informed in a meaningful way.

Renaissance placed its trust and confidence in Imagine Schools to create a successful learning environment and to manage the school's operations and its finances. The Operating Agreement itself outlines many duties entrusted to Imagine Schools, but Board President Tomika Booker also explained that she relied heavily on explanations provided by Imagine Schools employee, Sam Howard, and other Imagine Schools employees.

Based on this very strong evidentiary record, the Court finds that the five factor fiduciary test has been established by the greater weight of the evidence, and that Imagine Schools was a fiduciary to Renaissance during the relevant time period. Furthermore, even absent these factors, a fiduciary relationship may still arise as a matter of law by virtue of the parties' relationship or as a result of the special circumstances of the parties' relationship, such as when "one person relies upon and trusts the other with the management of his property and attendance of his business affairs." *Shervin v. Huntleigh Securities Corp.*, 85 S.W.3d 737, 740-41 (Mo. Ct. App. 2002); *McKeehan v. Wittels*, 508 S.W.2d 277, 280 (Mo. Ct. App. 1974). The facts outlined above and the testimony throughout this trial support a finding that the relationship between Imagine Schools and

6

Renaissance is a hallmark example of a fiduciary relationship arising out of the special circumstances of the parties' relationship. Indeed, Imagine Schools, the fiduciary, effectively took over the de facto persona of Renaissance, the entrustor.[1]

### B. Fiduciary Duties Owed by Imagine Schools to Renaissance

Having determined that Imagine Schools is a fiduciary of Renaissance, the Court turns to the duties that Imagine Schools owed to Renaissance and how those duties affect the burden of proof in this case. As a preliminary matter, the Court finds it appropriate to rely by analogy on fiduciary duties applied in other relationships such as agency law or corporate law. In fact, the overarching fiduciary duties discussed here have been analogized over time from one fact pattern to the next as equity dictates. *See* Tamar Frankel, *Fiduciary Law*, 71 Cal. L. Rev. 795, 796 (1983). While academics have struggled to find a unifying theory for all fiduciary relationships, *see* D. Gordon Smith, *The Critical Resource Theory of Fiduciary Duty*, 55 Vand. L. Rev. 1399 (2002), "[t]he duties of loyalty are substantially the same for all fiduciaries, varying only in intensity."

---

[1] Professor Tamar Frankel coined the term "entrustor" as a general term referring to the other party in a fiduciary relationship. *See* Tamar Frankel, *Fiduciary Law*, 71 Cal. L. Rev. 795, 800 n. 17 (1983). Professor Frankel explains that entrustor is the most descriptive, general term for this other party where the particular relationship does not have a title such as "principal" or "agent." *Id.* at note 17. Entrustor connotes both the "substitute function" of the fiduciary and the "delegation of power" feature of the relationship. *Id.* Professor Frankel writes:

> The first feature, the "substitution function," in which the fiduciary performs services as a "stand-in" for the entrustor, is suggested by the root "trust." (Note that most definitions of "fiduciary" include some aspect of trusting. See, e.g., Black's Law Dictionary 563 (5th ed. 1979) ("a person holding . . . a character analogous to that of a trustee, in respect to the trust and confidence involved in it.")). The second feature, the "delegation of power," in which the fiduciary is granted the power to perform these functions, is suggested by the entire word "entrust," which means "[t]o confide . . . the execution of (a task) . . . a person." 3 Oxford English Dictionary (pt. 2) 225 (J. Murray ed. 1897). . . . Furthermore, the word "entrust'" brings to mind a type of dependence that is characteristic of fiduciary relations.

*Id.* Given the *sui generis* relationship between Renaissance, a charter school, and Imagine Schools, a charter school management company, the Court refers to Renaissance as the entrustor.

Warren A. Seavey, Handbook of the Law of Agency 4 (1964) (Seavey is the Reporter for the Restatement (Second) of Agency). As the fiduciary's power grows, the intensity of its duties grows as well. Smith, *Critical Resource*, *supra*, at 1482. Given the almost complete legal and practical control Imagine Schools had over Renaissance's assets, the Court finds that at a minimum, a Missouri court would apply the fiduciary duties of an agent or corporate director to Imagine Schools under these circumstances.

In general, a fiduciary owes a duty of loyalty and due care to its principal. *See Kahn v. Royal Banks of Missouri*, 790 S.W.2d 503, 507 (Mo. Ct. App. 1990) (Stating that an agent is obligated "to be perfectly frank with his principal, to make full disclosure of all material facts, to strictly avoid misrepresentation, and in all respects to act with the utmost good faith, fidelity, and loyalty in the interest of the principal."); *Groh v. Shelton*, 428 S.W.2d 911, 916 (Mo. Ct. App. 1968) (same); *Markland v. Travel Travel Southfield, Inc.*, 810 S.W.2d 81, 84 (Mo. Ct. App. 1991) (stated in the context of a travel agent, but comparing a travel agent to "every agent"); *see also* Restatement (Second) of Agency § 387 (1958). The duty of loyalty required Imagine Schools to put the interest of Renaissance first – above the interest of Imagine Schools and anyone else. *See Kahn* 790 S.W.2d at 507; *McKeehan v. Wittels*, 508 S.W.2d 277, 281-82 (Mo. Ct. App. 1974). For example, Imagine Schools cannot engage in self-dealing with Renaissance absent informed consent. *McKeehan*, 508 S.W. 2d at 281-82. This prohibition against self-dealing lies at the heart of the fiduciary relationship. Restatement (Third) of Agency § 8.02. For there to be informed consent, the fiduciary must tell the principal all facts which the fiduciary knows or should know would reasonably affect the principal's

Case 4:13-cv-00645-NKL   Document 136   Filed 12/18/14   Page 8 of 29

judgment and the transaction must be fair to the principal. *Id.* at § 8.06; *see also Groh*, 428 S.W.2d at 916-17. In this case, consent could only be given by a majority of the Renaissance Board. The burden of proof is on the fiduciary to show all of these things to escape liability for self-dealing. Effectively, there is a presumption that self-dealing is not proper and the burden is on the fiduciary to show it was. *See Burlington Northern v. Burlington Resources,* 590 N.W.2d 433 (N.D. 1999); *see also Zakibe v. Ahrens & McCarron, Inc.*, 28 S.W.3d 373, 382 (Mo. Ct. App. 2000) ("In an equitable action to recover profits, once the corporation's transaction with a director, officer, or entity in which he or she has an interest has been established, the burden shifts to the officer or director who must show that he or she did not obtain secret profits and that the transaction was conducted fairly, honestly, and openly.").

A fiduciary also has a duty of care. That duty required Imagine Schools to perform its duties with the care and skill that is standard for a management company of its type. Restatement (Second) of Agency § 379. Due to the nature of Imagine Schools' responsibilities in the Operating Agreement, which required Imagine Schools to manage Renaissance's funds, pay its bills, and otherwise control its financial and academic property, this duty of care included a duty to keep and render Renaissance's accounts. Section 382 of the Restatement (Second) of Agency states that "an agent is subject to a duty to keep, and render to his principal, an account of money or other things which he has received or paid out on behalf of the principal." *See also O'Day v. Annex Realty Co.*, 236 S.W. 22, 24 (Mo. 1921) ("It is the general rule that the agent is bound to account to his principal for all money and property which may come into his hands by virtue of

the agency."); *Matter of Stickler's Estate*, 551 S.W.2d 944, 951 (Mo. Ct. App. 1977). This duty ordinarily includes not only the duty of stating to his principal the amount that is due, but also a duty of keeping an accurate record of the persons involved, of the dates and amounts of things received, and of payments made. Restatement (Second) of Agency § 382 cmt. a. Thus, Renaissance "has the burden of proof to show the existence of [a fiduciary] relationship and the receipt of money or property by [Imagine Schools]. The burden then shifts to [Imagine Schools] to show that [it] disposed of the money or property properly." *In re Lomantini*, 252 B.R. 469, 475 (Bankr. E.D. Mo. 2000); *O'Day v. Annex Realty Co.*, 236 S.W. 22, 24 (Mo. 1921); *Herr v. Graef*, 267 S.W. 30, 32 (Mo. Ct. App. 1924) (fiduciary who was required to collect rents on behalf of principal and make expenditures for repairs and improvement on principal's property had the burden of showing that charges made against principal's account were proper).

The Court now turns to the specific claims made in this case. To resolve these claims, the Court has only considered evidence that is relevant to the claims made by Renaissance or the Counterclaim filed by Imagine Schools. For example, the Court has not considered the poor performance of Renaissance students, except to rebut any argument made by Imagine Schools that all was well at the charter school.

### C. Count I Claims

In Count I of its Complaint, Renaissance alleges five ways in which Imagine Schools breached its fiduciary duty. [Doc. 1, ¶¶ 11a-11.e]. At trial, Renaissance withdrew two of those claims which are found in Paragraphs 11.b and 11.d of its Complaint. As a result, the claims in Paragraphs 11.b and 11.d will not be discussed.

### 1. Paragraph 11.a – Allocation of Charges for Equipment, Pensions, Insurance, and Payment of Miscellaneous Expenses

In this claim, Renaissance alleges that Imagine Schools breached its fiduciary duty because Imagine Schools paid itself, and/or its affiliated entities, the sum of $406,941.00 out of Plaintiff's funds, for reimbursement of items such as insurance premiums, payroll allocations, telecommunication costs, teacher pensions, some teacher salaries and certain other unexplained items. Most of these expenses were paid initially by Imagine Schools when it purchased equipment or services in bulk for all the schools it managed. Imagine Schools then allocated those costs among all the schools. Renaissance argues that these expenses should not have been charged to Renaissance because by the terms of the Operating Agreement, Imagine Schools was to pay for its own employees and its own expenses.

The greater weight of the evidence shows that the expenses for worker's compensation insurance, cellular telephones, scanners and pensions were expenses incurred for the benefit of Renaissance schools. It is correct that the staff at the Renaissance schools were employees of Imagine Schools, and that the Operating Agreement required Imagine Schools to pay for its own employees, but considering this section in *para material*, it is also clear that the Operating Agreement contemplated that Renaissance assets would be used to pay for teachers, staff, supplies and the equipment needed to run the Renaissance schools. *See* [Doc. 8-1, p. 12, Art. VI.A]. Intuitively, Renaissance would be expected to incur these expenses for the normal operation of the schools and there is no suggestion of double billing by Imagine Schools or that the

11

expenditures were unreasonable. It also makes sense that insurance, telecommunication, and pension services would be purchased in bulk and split between the schools based on use by individual schools. There is no evidence that Imagine Schools received any benefit from these bulk contracts such as getting its own expenses waived or other special benefits unique to Imagine Schools.

As for the allocation by Imagine Schools to Renaissance of salary expenses for personnel from other schools operated by Imagine Schools, Mr. Barry Sharp testified that personnel from other schools did work for Renaissance, and therefore, their salaries were allocated in part to Renaissance. The Operating Agreement gives Imagine Schools the right to obtain all staff for Renaissance, and the fact that they obtained that staff from other schools for a project at Renaissance for the benefit of Renaissance does not violate the terms of the Operating Agreement. *See id.* at pp. 12-13. While the vouchers do not identify the specific personnel that were assigned to do work for Renaissance, the fact that the payments were being made to other schools operated by Imagine Schools and not to Imagine Schools itself is evidence that Imagine Schools was not using Renaissance funds to pay Imagine Schools' central office employees who had no part in the operation of Renaissance.

However, as to the remaining unexplained expenses identified in Paragraph 11.a and in Julia Mast's expert report and testimony, Imagine Schools has not shown by the greater weight of the evidence that these expenses were properly allocated to Renaissance except for receipts showing Ms. Booker's trip to Washington, D.C. for a national conference on charter schools. The other expenses do not show on their face that some

12

benefit was received by Renaissance, and no testimony clarified how those expenses were properly allocated to Renaissance. The amount is small, but a fiduciary cannot keep any property belonging to an entrustor, for which the fiduciary has not properly accounted. Therefore, the Court enters judgment for Renaissance on this claim in the amount of $8,759.64.

### 2. Paragraph 11.c – Loans to Renaissance Personnel

On a few occasions during the term of its management agreement with Renaissance, Imagine Schools made loans to staff at Renaissance schools. Renaissance alleges this was a breach of Imagine School's fiduciary duty because the Operating Agreement did not authorize such loans. The Court finds in favor of Imagine Schools on this claim. While this is a close question, the Court finds that the giving of loans to personnel working at Renaissance schools was not outside the scope of the Operating Agreement. As previously explained, the Operating Agreement contemplated that Imagine Schools would hire staff for the Renaissance schools and the cost of that staff would be deducted from Renaissance funds. Giving small loans without interest is arguably a fringe benefit for the staff at Renaissance schools and given the small amount, the Court cannot say it violated the terms of the Operating Agreement.

### 3. Paragraph 11.d – Non- Payroll Disbursements to Staff of Renaissance Schools

In this claim, Renaissance alleges that Imagine Schools breached its fiduciary duty by using Renaissance funds to pay Imagine Schools' employees for expenses they incurred without proper documentation. As previously discussed, the Court concludes

13

that Imagine Schools was authorized by the Operating Agreement to pay for the expenses of the Renaissance school, and this includes reimbursing expenses incurred by employees who worked in the school so long as the expenses were for the benefit of the Renaissance schools. To the extent that Renaissance is arguing that the expenses were not authorized because they went to "Imagine employees" – even though the "Imagine employees" were the staff and teachers at Renaissance – the Court is unpersuaded.

However, as developed during the trial, both Renaissance and Imagine Schools primarily disputed whether the expenses being reimbursed were in fact for the benefit of Renaissance. The dispute focused specifically on whether the disbursements were made based on proper accounting procedures. Therefore, taking the pleadings and the evidence together, the Court addresses the question of whether Imagine Schools properly accounted for the funds paid to its employees allegedly for expenses incurred for the benefit of Renaissance schools.

Because the Court has already found that Imagine Schools was a fiduciary to Renaissance during the relevant time period, the normal accounting rules applicable to a fiduciary apply. The agent's duty in these respects is satisfied if it acts reasonably in view of the business customs of the community and the nature of his other employment. Restatement (Second) of Agency § 382 cmt. a. In other words, Imagine Schools had a duty to account for the expenditures it made using Renaissance's money and to do so in a way consistent with standard accounting principles. Imagine Schools is obligated to keep complete and accurate accounts or records, and if it has not done so, all doubts are resolved against it. *Zelch v. Ahlemeyer*, 592 S.W.2d 482, 485 (Mo. Ct. App. 1979).

"Loss or absence of records does not absolve [Imagine Schools] of the obligation to render a full account and [Imagine Schools] bears the burden of proving what the lost or absent records would show." *Id.*

Turning to the evidence, Julia Mast, Renaissance's accounting expert, identified many expense reimbursements that she concluded were not properly documented. Her testimony made sense and took into account that Imagine Schools was a fiduciary. She also has a substantial professional background and did not give the appearance in content or demeanor that she lacked objectivity. Her testimony contained some weak spots identified by opposing counsel, but the greater weight of the evidence as a whole gave the Court confidence in her conclusions. In contrast, the Court does not find the testimony of Imagine Schools' expert, Thomas Hilton, to be persuasive. First, Mr. Hilton suggested that Imagine School's accounting was sufficient because the Operating Agreement did not require Imagine Schools to use a specific kind of accounting such as that used by "large businesses" or the IRS to justify an expense deduction. He testified that employees of a "mom and pop" business would not be expected to keep receipts to justify expenses because it would be confusing and too time consuming. Mr. Hilton also thought the expenses were proper because they were approved by Imagine Schools and because there was no specific standard of care set out in the Operating Agreement. Even when presented with receipts that were clearly duplicates or were almost certainly not for the benefit of Renaissance, Mr. Hilton continued to assert that Imagine Schools applied correct accounting principles.

When Ms. Mast's testimony raised questions about missing evidence, such as whether an employee who received a check for attending a conference actually attended the conference, Imagine Schools did not present evidence that the employee attended. According to Ms. Mast, requiring documentation for such an expenditure is not an uncommon level of documentation for a business, and she believed it would be particularly appropriate in the context of a fiduciary relationship. Because Imagine Schools' employees were the ones with the information necessary to substantiate that payments were paid for legitimate expenses, it was incumbent on Imagine Schools to come forward with evidence at trial to justify the expenditure. This is particularly true because the evidence is more readily accessible to Imagine Schools and would be consistent with Imagine Schools' duty as a fiduciary to confirm attendance, etc. as if it were its own money being spent. *See Anderson v. Clemens Mobile Homes, Inc.*, 333 N.W.2d 900, 905 (Ne. 1983) ("Although the burden is ordinarily upon the party seeking an accounting to produce evidence to sustain the accounting, where another is in control of the books and has managed the business, that other is in the position of a trustee and must make a proper accounting."); *see also Engelsmann v. Holekamp*, 402 S.W.2d 382, 389 (Mo. 1966) (stating that once a fiduciary relationship is proved to exist, the "burden is thrown upon" the agent to show that his duties have been performed and that "[i]t is assumed that the agent or trustee has means of knowing, and does know, what the principal . . . cannot know, and is bound to reveal the entire truth.").

There is, however, a problem calculating the amount of damages to be awarded on this claim. At trial, Ms. Mast wanted to update her damage calculation because Imagine

16

Schools had recently provided additional documentation to justify reimbursements. Even though her updated figures would reduce the amount of damages being requested, Counsel for Imagine Schools objected to the change because Renaissance had failed to submit an updated expert report as required by the Federal Rules of Civil Procedure. Ultimately, the Court ruled in favor of Imagine Schools to ensure it had a full opportunity to challenge Ms. Mast's calculation. However, given the fact that Ms. Mast wished to reduce her damage calculation, the Court finds damages to be $37,907.41. This is not the amount submitted at trial, but rather, is the amount Renaissance wished to present to the Court in Mast's amended report. Imagine Schools gave no other reason for refusing to permit the lower figure which was clearly in Imagine Schools' favor. The Court concludes that substance, not procedure, should control here.

### D. Counts II and III – Breach of Fiduciary Duty Based on SchoolHouse Finance Lease

As to Counts II and III, the Court finds in favor of Renaissance. Counts II and III relate to leases Renaissance signed with SchoolHouse Finance for two buildings used to house the Renaissance schools: the Kensington building and the Wallace building. Imagine Schools arranged and negotiated the leases with SchoolHouse Finance and presented the negotiated leases to the Renaissance Board for signature and approval. SchoolHouse Finance, the entity that leased the buildings to Renaissance, is owned by Imagine Schools. This clearly constituted self-dealing; all benefits received by SchoolHouse Finance were for the benefit of Imagine Schools because it was the sole owner of SchoolHouse Finance.

As previously discussed, a fiduciary owes a duty of loyalty to its principal. "Inherent in a fiduciary relationship and its resulting duty of loyalty is the obligation of the agent not to engage in self-dealing . . . ." *Emerson Elec. Co. v. Marsh & McLennan Cos.*, 362 S.W.3d 7, 18 (Mo. 2012); Restatement (Third) of Agency § 8.02. Therefore, absent consent, a fiduciary may not deal with its principal "as an adverse party in a transaction connected with [its] agency." Restatement (Second) of Agency § 389. As discussed above, for there to be informed consent, the fiduciary must tell the principal all facts which the fiduciary knows or should know would reasonably affect the principal's judgment, and the transaction must be fair to the principal. Restatement (Third) of Agency § 8.06; *see also Groh*, 428 S.W.2d at 916-17. In this case, consent could only be given by a majority of the Renaissance Board, and the burden of showing consent by the Board is on Imagine Schools. *See Burlington Northern v. Burlington Resources,* 590 N.W.2d 433 (N.D. 1999); *Zakibe v. Ahrens & McCarron, Inc.*, 28 S.W.3d 373, 382.

The record is clear that Imagine Schools' lease agreement with Renaissance was an "adverse" transaction and that Imagine Schools did not obtain Renaissance's informed consent for its self-dealing. While the Court believes that some Renaissance board members were told that Imagine Schools and SchoolHouse Finance were related companies, there is no evidence that a majority of the Renaissance Board was so told, and statements that the two companies were related which were buried in financial documents or the Imagine Schools' website cannot be an implied disclosure. More importantly, there is no evidence that Imagine Schools ever told any Renaissance board member how Imagine Schools would benefit from the leases. Imagine Schools did not explain that

18

SchoolHouse Finance intended to sell the Kensington and Wallace buildings to a real estate investment trust to recoup the capital expenditures made by SchoolHouse Finance and then lease the real estate back from the real estate trust at a lower rate than SchoolHouse Finance was charging Renaissance. There is also no evidence that Imagine Schools discussed the market rate for similar leases with the Renaissance Board or informed the Board that SchoolHouse Finance calculated the rental rate based on a twelve percent return on investment regardless of the market rate. Imagine Schools did not inform the Renaissance Board that the school would incur higher-than-average costs for overhead, including rent, which would result in lower-than-average instructional expenditures, including textbooks, classroom supplies, and teacher salaries, which was exactly what happened. Julia Mast testified that Renaissance spent significantly less on instruction and more on administration and operation than public schools both nationally and in Missouri. For example, in 2007-2008, Renaissance spent 27.9 percent of its funds on instructional costs while the national average was 65.82 percent and Missouri was 64.62 percent. In contrast, the national and Missouri averages for operational costs were 18.01 percent and 19.62 percent, respectively, while Renaissance's operational costs were 35.09 percent of its funds. [Exh. P89, "Opinion 8"]. These discrepancies were consistent for the entire 2007-2011 period.

Considering the evidence as a whole, the Court finds that Imagine Schools never made the type of meaningful disclosure about its self-dealing that a fiduciary is required to do, and therefore no consent ever occurred even if some Renaissance board members were aware that Imagine Schools owned SchoolHouse Finance. Further, as explained

below in the discussion of damages, the lease between Renaissance and SchoolHouse Finance (the wholly owned subsidiary of Imagine School) was not fair to Renaissance.

Because Imagine Schools breached its fiduciary duty to Renaissance, it must compensate Renaissance for any damages Renaissance incurred. *See* Restatement (Second) of Agency § 401.  In addition, if Imagine Schools made a profit from its self-dealing, it has a duty to Renaissance to account for such profit and disgorge it.  *Id.* at § 403; *see also id*. at § 403 cmt. a. (discussing an agent's liability when the agent, without disclosing relevant facts, acts improperly for an adverse and competing person); *id.* at §407; *Zakibe v. Ahrens & McCarron, Inc.*, 28 S.W.3d 373, 382 (Mo. Ct. App. 2000).

Renaissance claims it was damaged in part because it was charged above market rental rates for the Kensington and Wallace buildings.  In support of this claim, Renaissance called Mr. Joseph Oliaro, a commercial real estate broker.  Mr. Oliaro testified about the market rate for business real estate in the area where the Kensington and Wallace buildings were located and concluded Renaissance was charged above market rent rates.  However, Mr. Oliaro only made a preliminary report; he never walked inside the Kensington and Wallace buildings and did not know that over $10 million had recently been spent refurbishing the buildings.  Nor did he ever walk into the buildings he was comparing to the Kensington and Wallace buildings.  In addition, the Court finds no evidence that he compared actual leases for his comparator properties to support his conclusion that the market rate for those properties included all maintenance, taxes, and insurance.  That said, Mr. Oliaro's per square foot base rental rate calculation is consistent with what SchoolHouse Finance paid per square foot to lease the Kensington

and Wallace properties from the real estate investment trust. But Mr. Oliaro's testimony that his base rental rate included taxes, insurance, maintenance, etc. was not supported.

Imagine Schools called an expert, Mr. Troy Smith, who claimed that the market rate should be calculated by comparing charter school properties in other states rather than business property located around the Kensington and Wallace buildings. Although there are other charter schools in Missouri and throughout the United States, Mr. Smith relied only on the rental rate being charged at other charter schools managed by Imagine Schools in other states. This is particularly unreliable because Imagine Schools has been criticized in other locations for charging above market rates, and this lawsuit is about Imagine Schools charging above market rates in Kansas City. Further, if Imagine School could have located other charter schools being charged similar rates elsewhere, the Court expects it would have presented that evidence. Therefore, the Court finds Mr. Smith's expert testimony unpersuasive.

Having found that both damage experts had deficiencies in their testimony, the Court concludes that the most reliable damage evidence came from Mr. Sharp, who is Imagine Schools' CEO and President. He testified that after acquiring and renovating the Kensington and Wallace buildings, SchoolHouse Finance sold the buildings to EPR Properties, a real estate investment trust, in order to free itself up to make more real estate purchases for other charter schools it was starting. EPR Properties then leased the properties back to SchoolHouse Finance for an annual rental rate of approximately 10 percent of the total development cost of the properties. In contrast, SchoolHouse Finance's lease to Renaissance for the very same buildings was 12 percent of the

21

development costs, two per cent higher than what SchoolHouse Finance paid to EPR Properties.  Thus, the Court concludes that a fair market rate for these buildings was, at most, 10 per cent of development costs.  There is no evidence that the transaction between SchoolHouse Finance and EPR Properties was other than an arms-length business transaction which would be expected to produce a market rate.

Mr. Sharp further testified that the total development cost of the properties was approximately $12.2 million.  This means that SchoolHouse Finance paid EPR Properties an annual rental rate of 10 percent of $12.2 million, or approximately $1,220,000 per year.  Had that rate been charged to Renaissance over the forty-six month period at issue, Renaissance would only have paid $4,676,600 for the properties.  In contrast, Renaissance paid SchoolHouse Finance an annual rental rate of 12 percent of the $12.2 million development costs which totaled $5,612,000 over the forty-six month period at issue.[2]  The difference is approximately $935,400 which the Court finds is the amount that Renaissance was overcharged by SchoolHouse Finance, the wholly owned subsidiary of Imagine Schools.  This calculation is also consistent with Mr. Sharp's testimony that SchoolHouse Finance made a profit from the lease arrangement of "less than a million dollars," which Imagine Schools' counsel rounded up to approximately $1 million.

Mr. Sharp testified, however, that Imagine Schools actually lost money on the property in question because when the property was eventually sold they only recovered $ 3.35 million of their $12.2 million investment.  However, the relevant question is not

---

[2] Julia Mast testified that Renaissance paid $5,553,978 to rent the buildings over the forty-six month period.  But Julia Mast testified that her records were incomplete because she was unable to get some documentation from Imagine Schools, particularly for the first few months of rent.

whether SchoolHouse Finance and Imagine Schools eventually made a profit or loss of their real estate investment. The issue is what would be a fair market rental rate during the time it was being rented to Renaissance. Further, the period of self-dealing while Imagine Schools was in a fiduciary relationship with Renaissance is the time period relevant to damages. What eventually happened with the buildings after the fiduciary relationship ended is not relevant, especially in light of the precipitous decline in real estate prices after the schools closed.

Mr. Sharp also suggested that the market rate and the fairness of the Renaissance leases should take into account how much risk SchoolHouse Finance took when it rented the buildings to Renaissance because Renaissance did not have a guaranteed stream of income and had no credit history, etc. However, SchoolHouse Finance bought the buildings and renovated them before a lease was even submitted to Renaissance for its consideration. SchoolHouse Finance owned the Kensington and Wallace buildings and had substantially completed the renovations even before a charter was issued to Renaissance. Therefore, at the point that Renaissance signed the lease, SchoolHouse Finance was lucky to find anyone to rent the buildings which had been designed specifically for a school. Had Renaissance rejected the lease or negotiated for better terms, there is no evidence that SchoolHouse Finance had any other potential tenant to take the property at any price. Thus, the record does not support a finding that SchoolHouse Finance could command an above market rate because of Renaissance's financial condition.

Mr. Sharp also testified that from the time the leases were signed to the time Renaissance terminated its charter and vacated the properties, SchoolHouse Finance paid $491,500 in real estate taxes that Renaissance was required to pay under the terms of its leases with SchoolHouse Finance. According to Mr. Sharp, SchoolHouse Finance did not seek reimbursement. Imagine Schools seems to suggest that this is further evidence that SchoolHouse Finance and Imagine Schools never profited from the arrangement and that the rent paid was fair. The Court rejects this argument because the Court does not find Mr. Sharp's testimony believable. Imagine Schools charged Renaissance diligently for expenses owed – right down to the t-shirts worn by Renaissance staff. The Court finds incredible that Imagine Schools and SchoolHouse Finance overlooked half of a million dollars in taxes owed by Renaissance. Further, Imagine Schools had primary control over the records, including voluminous financial documents some of which it admitted in evidence, yet it pointed to no documents to show SchoolHouse Finance paid the taxes but never sought reimbursement. Nor did it provide some explanation as to how that could have occurred. In addition, in its Counterclaim, Imagine Schools never claimed this amount as due and owing. Therefore, the Court will not deduct from Renaissance's damages any figure to reflect taxes which were allegedly not paid under the lease.

In summary, the Court finds that Imagine Schools breached its fiduciary duty to Renaissance School by self-dealing which resulted in above market real estate rents being charged to Renaissance. A fair estimate of the damages sustained by Renaissance as a

result of this breach is $935,400. This amount covers the claims raised in both Counts II and III.[3]

## III.    Count IV – Unjust Enrichment

In Renaissance's Amended Count IV, it seeks the return of approximately $2 million paid to Imagine Schools from 2008 to 2011. There are eleven categories of sums sought by Renaissance, but these categories are all duplicative of sums sought in Counts I-III. Thus, any damages sought under the unjust enrichment claim would either be duplicative or unproven. Duplicative damages are not permissible, *Meco Sys., Inc. v. Dancing Bear Entm't, Inc.*, 42 S.W.3d 794, 810-11 (Mo. Ct. App. 2001), and it would not be unjust for Imagine Schools to retain the benefit of money to which the Court found it to be entitled.

Judgment on Count IV is in favor of Imagine Schools.[4]

## IV.    Count V - Conversion

It is undisputed that while Imagine Schools was providing management services to Renaissance, Imagine Schools was in possession of all student records for Renaissance

---

[3] In Counts II and III, Renaissance also seeks reimbursement for the insurance and maintenance costs, taxes, base rent escalations, and other fees it paid to SchoolHouse Finance under the triple net and escalation clauses in the original and amended leases. *See* [Doc. 1, ¶¶ 31, 45]. Because the Court does not find persuasive Mr. Oliaro's opinion that his comparable properties included these expenses in his estimate of a fair market rental rate, the Court does not find in favor of Renaissance on its request for additional damages. In addition, Renaissance has not otherwise proved by the greater weight of the evidence that negotiating a triple net lease provision or including an escalation clause was outside the norm for real estate transactions in the area, even ones that did not include self-dealing.

[4] In its post-trial briefing, Renaissance suggests it is entitled to the return of management fees paid after Imagine Schools breached its fiduciary duty by negotiating leases for Renaissance with SchoolHouse Finance. But this claim was not pleaded and was not raised by Renaissance when it responded to Imagine Schools' Motion to Dismiss Count IV in the original Complaint. Nor was it argued during trial. Therefore, it has not been considered by the Court.

students, including such things as high school graduation records. Upon termination of the Operating Agreement between the parties, Renaissance asked for the return of those school records. Renaissance alleges that Imagine Schools did not return all the school records and that therefore, there has been a conversion.[5] Imagine Schools claims that it did return the records. In support of its claim, it points to evidence that Renaissance purchased storage for its records after the termination of the Operating Agreement. However, Renaissance representatives testified that the storage was for only part of the records and it is the remaining records that they are seeking damages for if the records are not returned. Because Imagine Schools has failed to show by the greater weight of the evidence that all student records were returned to Renaissance, the Court finds there has been a conversion.

While there is no proof of actual damage, Missouri courts have stated that "there is nothing in the definition of conversion or the methods of establishing it which indicates that damages must actually be caused. Indeed, it has been repeatedly held that where a conversion is established [a] plaintiff is entitled . . . at least to nominal damages. Thus, it is clear that the emphasis is on the nature of the act of conversion, not its result." *Lacks v. R. Rowland & Co.*, 718 S.W.2d 513, 521 (Mo. Ct. App. 1986).

Therefore, the Court awards Renaissance nominal damages in the amount of $1.00 and punitive damages in the amount of $15,000, taking into consideration that Imagine Schools has placed a burden on Renaissance to account to students and the State of

---

[5] Conversion is proved by evidence of refusal to give up possession of personal property to the owner on demand. *Envirotech v. Thomas*, 259 S.W.3d 577 (Mo. Ct. App. 2008).

Case 4:13-cv-00645-NKL   Document 136   Filed 12/18/14   Page 26 of 29

Missouri for missing student records and to defend itself in a lawsuit for loss of these records. However, since it is in the interest of both parties that the records be accounted for so that students will not suffer harm, the parties are encouraged to work together to find the missing records. If all student records can be accounted for, Imagine Schools may seek review of this damage award pursuant to Federal Rule of Civil Procedure 60 based on new evidence that the documents have been recovered.

## V.  Imagine Schools' Counterclaim

Imagine Schools filed a Counterclaim against Renaissance alleging that Renaissance breached Article V, Section J of the Operating Agreement when it failed to pay approximately $339,833.46 in management fees, and Article V, Section K of the Operating Agreement when it failed to repay approximately $260,658.96 in operating advances provided to it by Imagine Schools. [Doc. 56].

Imagine Schools is not entitled to the unpaid management fees under Article V, Section J of the Operating Agreement because it breached its fiduciary duty to Renaissance. *See* Restatement (Second) of Agency §§ 456, 469; *Zakibe v. Ahrens & McCarron, Inc.*, 28 S.W.3d 373, 385 (Mo. Ct. App. 2000). In addition, for the period of time for which these management fees were not paid, the relationship between Imagine Schools and Renaissance had so deteriorated as a result of Imagine Schools' breaches, that Imagine Schools was unable to properly render services.

In fact, Barry Sharp testified that Imagine Schools was unable "to provide a lot of the services under the agreement during those last several [months]." This is because the Renaissance Board did not permit Imagine Schools to continue providing services to the

27

school after it continuously failed to comply with requests for financial information and after the Board became aware of self-dealing behavior and other school performance issues.

As to its claim for unpaid operating expenses, Imagine Schools has not proved by the greater weight of the evidence that Renaissance owes Imagine Schools approximately $260,658.90 under Article V, Section K of the Operating Agreement. Barry Sharp, who testified about Imagine Schools' Counterclaim, did not testify that there were unpaid operating advances, and even if he had, he did not testify as to what amount is unpaid. Further, in Imagine Schools' post-trial supplemental briefing, there is no mention of the operating advances allegedly owed by Renaissance. In fact, the last sentence of Imagine School's brief states that "the Court should enter judgment requiring Renaissance to pay Imagine Schools the management fees that are due for the period extending to June 30, 2011, plus prejudgment interest, post judgment interest, costs and attorneys' fees." Noticeably absent from this statement is a request for unpaid "Operating Advances." Accordingly, judgment on the Counterclaim is entered in favor of Renaissance.

## VI.     Conclusion

For the reasons set forth above, the Court enters judgment in favor of Renaissance on:

Count I, Paragraph 11.a in the amount of $8,759.64;

Count I, Paragraph 11.d in the amount of $37,907.41;

Counts II and III in the amount of $935,400;

Count V in the amount of $1.00 in nominal damages and $15,000 in punitive

28

damages.

The Court also enters judgment in favor of Renaissance on Imagine Schools'

Counterclaim.

The Court enters judgment in favor of Imagine Schools on Count I, Paragraph

11.c, Count IV, Count VI, and Count VII. Costs are taxed against Imagine Schools.


                                        s/ Nanette K. Laughrey
                                        NANETTE K. LAUGHREY
                                        United States District Judge
Dated: December 18, 2014
Jefferson City, Missouri